**Richard R. Best**
**Sanjay Wadhwa**
**Sheldon L. Pollock**
**Daniel Michael**
**Osman Nawaz**
**Philip A. Fortino**
**Lindsay S. Moilanen**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-1014 (Fortino)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>        **Plaintiff,**<br><br>      v.<br><br>**CHARLES SAMEL,**<br><br>        **Defendant.** | **COMPLAINT**<br><br>20 Civ. \_\_\_\_\_ (   )<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against defendant Charles Samel ("Samel" or "Defendant"), alleges as follows:

## SUMMARY

1. This civil action concerns Defendant's role in a string of frauds by the International Investment Group ("IIG") to cover up tens of millions of dollars in investor losses on bad bets and keep its investment advisory business afloat.

2. During the relevant period, Samel was a paid consultant to IIG, a registered investment adviser that specialized in trade finance lending—risky loans to small- and medium-

sized companies in emerging markets. IIG served as the investment adviser to several private investment funds, including the Trade Opportunities Fund ("TOF").

3. Beginning in or about 2007, IIG, substantially assisted by Samel, engaged in a practice of hiding losses in the TOF portfolio by overvaluing troubled loans and replacing defaulted loans with fake "performing" loan assets.

4. Specifically, in March 2015, Samel substantially assisted IIG's principals in concealing the nature of a substantial fake loan asset by providing false information to TOF's auditors about the supposed debtor and preparing a sham loan sale agreement, which made it appear TOF had sold the fake loan for full value and which was provided to TOF's auditors. In reality, the loan never existed and, TOF was able to hide sustained losses from investors.

5. Through the conduct alleged herein, Samel is liable for aiding and abetting IIG's violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act").

6. The relief sought in this action is necessary to, among other things, prevent Defendant from further violating the federal securities laws.

## VIOLATIONS

7. By virtue of the foregoing conduct and as alleged further herein, Defendant has aided and abetted IIG's violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2)].

8. Unless Defendant is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9. The Commission brings this action pursuant to the authority conferred upon it by Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

10. The Commission seeks a final judgment: (a) permanently enjoining Defendant from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering Defendant to disgorge all ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment interest thereon; (c) ordering Defendant to pay civil money penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and (d) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Sections 209(d), 209(e), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), and 80b-14].

12. Venue is proper in this District pursuant to Section 214(a) of the Advisers Act [15 U.S.C. § 80b-14(a)] because the acts and transactions constituting violations of the Advisers Act occurred within the Southern District of New York and because during relevant time, IIG's offices were in Manhattan, Samel maintained a residence in Manhattan, and Samel sent sham loan documents to IIG executives in Manhattan.

13. In connection with the conduct alleged in this Complaint, Defendant, directly or indirectly, made use of the means or instrumentalities of transportation or communication in, and the means or instrumentalities of, interstate commerce.

## DEFENDANT

14. **Samel,** age approximately 70, resides in Sherman Oaks, California. He served as an independent consultant to IIG from at least 2010 to 2018. In this role, Samel ostensibly was

responsible for sourcing investments for IIG and IIG's clients. Samel was charged by the Commission in 2005 with violations of Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, as well as aiding and abetting violations of Section 15(d) of the Exchange Act and Rules 12b-20, 15d-13, and 15d-14 thereunder in connection with accounting fraud and reporting violations by Penthouse International, Inc. *SEC v. Penthouse Int'l Inc. et al*, 05-civ-0780 (RWS). Samel settled the Commission's action in 2007 without admitting or denying the allegations in the complaint, consenting to an injunction, civil penalties of $60,000, and a five-year officer and director bar.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

15. **IIG**, a New Jersey limited liability company based in New York City, was registered with the Commission as an investment adviser from 1995 until November 2019, when the Commission revoked its registration. IIG served as an investment adviser for multiple private funds and other institutional clients. According to its Form ADV filed in March 2018, IIG had, as of then, $373 million in regulatory assets under management. The SEC previously charged IIG with securities fraud (*SEC v. International Investment Group LLC*, 20 Civ. 10796 (filed Nov. 21, 2019)), and revoked IIG's registration as an investment adviser on November 26, 2019. On March 30, 2020, the SEC obtained a final judgment on consent that enjoins IIG from violating the antifraud provisions of the federal securities laws and requires IIG to pay more than $35 million in disgorgement and prejudgment interest.

16. **Trade Opportunities Fund or TOF**, founded in 1998, is a private investment fund and investment advisory client of IIG. During the relevant period, TOF's investment strategy was focused on trade finance loans and related investments. TOF's investors include various US-based and foreign-based institutional investors, including hedge funds, pension

funds, and insurance companies. TOF currently is in insolvency proceedings in Curaçao, where the fund is domiciled.

17.     **David Hu ("Hu")** (CRD No. 2163556) was a registered representative associated with the broker-dealers IIG Horizons Securities, LLC from March 1997 to February 2012, Smith Barney Inc. from 1993 to 1994 and Nomura Securities International, Inc. from 1991 to 1993. Hu previously held Series 7, 24, and 63 licenses. Hu is a founder, managing partner, and CIO of IIG and as CIO held primary responsibility for IIG's investment decisions. Hu currently is not registered in any capacity. Hu is a 50% owner of IIG. Hu was charged by the Commission (*SEC v. David Hu*, No. 20 Civ. 5496 (S.D.N.Y. filed July 17, 2020)) for violations of the antifraud provisions of the federal securities laws. In addition, Hu was charged by the U.S Attorney's Office for the Southern District of New York (*United States v. Hu*, No. 20 Cr. 360 (S.D.N.Y. filed July 17, 2020)) with securities fraud, wire fraud, as well as conspiracy to commit investment adviser fraud, securities fraud, and wire fraud.

## FACTS[1]

### Background on IIG and Trade Finance Loans

18.     Since its inception in 1994, IIG specialized in advising clients with respect to investments in emerging market economies.

19.     In or about 1998, IIG launched TOF and became the investment adviser to the fund, pursuant to an investment advisory contract. At IIG's recommendation, TOF invested in several different types of assets and securities, but it principally invested in trade finance loans.

---

[1]     Samel entered into two tolling agreements with the Commission. The first agreement covered the period of August 8, 2019 to December 31, 2019 (145 days), and the second agreement covered the period February 25, 2020 to August 31, 2020 (182 days). The two agreements combined tolled the statute of limitations for 332 days.

20. Trade finance loans are loans made to small- to medium-sized businesses, usually commodities exporters located in emerging markets, such as Latin America. The loans typically are risky investments because the borrower's ability to repay could be impacted by less stable regulatory and economic conditions in the borrower's home country. In order to mitigate the risk of these investments, trade finance loans typically are secured by collateral, which may include one or more of receivables, inventories, and assets.

21. TOF was valued on a regular basis including through a determination of the funds' net asset values ("NAV"), and IIG received compensation based on NAV and performance calculations. With the exception of one position, every trade finance loan in TOF's portfolio was valued by IIG at par plus accrued interest throughout the entire life of the fund.

### IIG Hides Losses in TOF

22. Beginning in or about 2007, IIG engaged in various deceptive acts to misrepresent the performance of and conceal losses in TOF, including overvaluing portfolio assets and replacing non-performing assets with fictitious loans that were reported as if they were legitimate performing assets.

23. In or about 2007, when TOF's gross asset value was approximately $300 million, IIG learned that a $30 million loan by TOF to a South American coffee producer (the "Coffee Loan") had defaulted.

24. Fearing that existing investors would flee the fund and that ongoing fundraising efforts would suffer if the loss were disclosed, IIG's two co-owners, Hu and Executive-1, decided to conceal the loss and knowingly erroneously valued the loan at par plus accrued interest on the TOF's books.

25. The overvaluation of the Coffee Loan substantially inflated the NAV reported to TOF investors.

26. When it became untenable to continue to carry the Coffee Loan on TOF's books as a performing asset due to auditor scrutiny, Hu and Executive-1 enlisted Samel to assist them in continuing to hide the loan losses through other means.

27. Hu, Executive-1, and Samel agreed on a plan to swap the defaulted Coffee Loan with new loans made to other borrowers (the "Substitute Loans").

28. The Substitute Loans were fake. The purported borrowers were foreign companies operating in other industries. The purported borrowers never received anything of value from TOF, and there was no expectation they ever would make any payments to TOF.

29. Samel understood that the Substitute Loans were fake. He identified the companies that would become the borrowers on the Substitute Loans. He also arranged for the companies to provide fraudulent confirmations of the debts upon any inquiry.

30. At the direction of Executive-1, in the case of one Substitute Loan, Substitute Loan-1, Samel negotiated and arranged for monthly payments from TOF to an attorney in exchange for such confirmations.

### IIG and Samel Concealed the Fraudulent Nature of Certain TOF Assets from TOF's Auditor

31. In March 2015, TOF's auditor, Auditor-1, began an audit of TOF's financial condition for the period ending December 31, 2013.

32. On or about March 5, 2015, Auditor-1 sought information from Executive-1 about Substitute Loan-1, which then had an outstanding balance of approximately $13.4 million.

7

33. Auditor-1 noted that it appeared that Substitute Loan-1 had not been serviced for several years and that the interest on the loan was capitalizing. Capitalization means unpaid interest is added to the principal amount of the loan.

34. Under the circumstances, Auditor-1 indicated it would need sufficient documentary evidence of the customer's ability to repay the loan and interest or IIG would need to take a provision of up to 100 percent of the loan's value.

35. Executive-1 alerted Samel to Auditor-1's inquiry on or about March 6.

36. On or about March 10, Auditor-1 informed Executive-1 that its concerns about Substitute Loan-1 remained unaddressed.

37. In addition, Auditor-1 raised concerns about a $10.7 million deposit with a financial institution (the "Deposit Account"). The Deposit Account was another fake asset put onto TOF's balance sheet by Hu and Executive-1 to cover-up losses. Auditor-1 stated that it was having difficulty verifying the identity of the entity that supposedly held the account and questioned whether the entity was licensed to hold such an account.

38. Auditor-1 informed Executive-1 that failure to address the issues on Substitute Loan-1 and the Deposit Account could result in a scope limitation of the audit or a qualification on these assets.

39. These outcomes would have potentially flagged problems with Substitute Loan-1 and the Deposit Account with investors in TOF.

40. In order to avoid a red flag arising from the audit, Hu, Executive-1, and Samel jointly engaged in deceptive conduct to mislead Auditor-1.

41. First, Samel, along with Hu and Executive-1, prepared a bullet point narrative about Substitute Loan-1 to be provided to Auditor-1. The document purported to detail the

history of the supposed collateral and an agreement by the borrower to provide additional collateral that month.

42. In addition to providing this information, Samel worked with others to prepare a sham agreement providing for the sale by TOF of both Substitute Loan-1 and the Deposit Account.

43. The purpose of preparing the sham agreement was to give the impression that the assets had been sold and therefore the questions being raised by Auditor-1 were moot.

44. On or about March 17, 2015, Executive-1 sent Samel a partially filled-in loan sale agreement, providing for the sale of unidentified loan assets to an unidentified purchaser.

45. Samel promptly forwarded the sham agreement to an associate of his who previously had assisted him in identifying the borrower for Substitute Loan-1 ("Individual-1").

46. Samel arranged for an entity controlled by Individual-1 ("Purchaser-1") to agree to purchase Substitute Loan-1 and the Deposit Account from TOF.

47. On or about March 18, 2015, Samel procured a signed agreement from Purchaser-1 providing for the sale of the assets to Purchaser-1 for approximately $24 million (the "Asset Purchase Agreement").

48. It was understood among Executive-1, Samel, and Individual-1 that the Asset Purchase Agreement was a sham and that Pruchaser-1 would not be receiving valuable assets and would not pay TOF the stated purchase price of more than $24 million.

49. That same day, Executive-1 sent to Auditor-1 a copy of the narrative Samel, Hu, and Executive-1 had prepared, as well as a copy of the Asset Purchase Agreement.

50. Samel knew, or was recklessly disregarded the risk, that both the information he provided to Executive-1 and the Asset Purchase Agreement would be provided to Auditor-1.

51. Auditor-1 subsequently attempted to verify the authenticity of the Asset Sale Agreement. Executive-1 referred the inquiry to Samel who arranged for a representative of Purchaser-1 to confirm the existence of the sham transaction.

52. The Purchaser-1 representative subsequently reported back to Samel: "Call done with auditors. No issues."

53. Auditor-1 issued the audited financial statements for TOF as of December 31, 2013 on or about March 21, 2015. Auditor-1 expressed a qualified opinion that the financial statements presented fairly, in all material respects, the consolidated financial position of [TOF] as at December 31, 2015 …." The only qualification to Auditor-1's opinion did not pertain to Substitute Loan-1 or the Deposit Account, which were not cited in the audit report.

54. IIG thereafter provided copies of the audited financial statements to TOF investors.

## FIRST CLAIM FOR RELIEF

### Aiding and Abetting Violations of Sections 206(1) and (2) of the Advisers Act

55. The Commission realleges paragraphs 1 through 54, above.

56. IIG, who had an adviser-client relationship with, and therefore owed a fiduciary duty to, TOF, violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S. Code § 80b-6(1), (2)].

57. Specifically, in or about March 2015, IIG, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, (a) employed a device, scheme, or artifice to defraud a client or prospective client; and/or (b) engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon a client or prospective client.

58.     Samel knowingly or recklessly provided substantial assistance to IIG with respect to its violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S. Code § 80b-6(1), (2)]. Specifically, Samel substantially assisted IIG's fraud on TOF by (i) compiling false information to falsely substantiate the fake Substitute Loan-1, (ii) arranging, and documenting the sham sale of Substitute Loan-1 and the fake Deposit Account.

59.     By reason of the foregoing, Samel is liable pursuant to Section 209(f) of the Advisers Act for aiding and abetting IIG's violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S. Code § 80b-6(1), (2)] and, unless enjoined, Samel will again aid and abet these violations.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court grant the following relief:

### I.

A final judgment permanently restraining and enjoining Defendant from directly or indirectly committing future violations of Section 206 of the Advisers Act [15 U.S.C. § 80b-6];

### II.

A final judgment ordering Defendant to disgorge all ill-gotten gains or unjust enrichment, plus prejudgment interest thereon;

### III.

A final judgment ordering Defendant to pay civil monetary penalty pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

**IV.**

Granting such other and further relief as the Court deems just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Dated: New York, New York
December 21, 2020

Respectfully submitted,

By: /s/ Daniel Michael
Richard R. Best
Sanjay Wadhwa
Sheldon L. Pollock
Daniel Michael
Osman Nawaz
Philip A. Fortino
Lindsay S. Moilanen
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE
 COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-1014 (Fortino)
FortinoP@sec.gov